UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| JERRY RANDOLPH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | 1:08-cv-046-LJM-DML |
| | ) | |
| COCA COLA BOTTLING CO., | ) | |
| | ) | |
| Defendant. | ) | |

**Entry Discussing Motion for Summary Judgment,
Vacating Settlement Conference, Final Pretrial Conference and Trial,
and Directing the Entry of Final Judgment**

### I. Background

Jerry Randolph ("Randolph")'s employment with Coca Cola Bottling Company ("Coke") was terminated on January 25, 2007. Randolph alleges that the termination was based on his race. Specifically, Randolph contends that: 1) he was verbally harassed due to his race; 2) nothing was done when he had problems with the time clock; 3) when he was injured at work no one would take him to the hospital; 4) he was required to use a blank sheet of paper to record inventory; 5) he was not offered leave pursuant to the Family and Medical Leave Act ("FMLA") when he had dental problems; and 6) a white employee was given 11 attendance points when he was fired and Randolph was fired after acquiring 10 points. Coke seeks resolution of these claims through the entry of summary judgment.

For the reasons explained in this Entry, Coke's motion for summary judgment (dkt 36) is **granted**.

### II. Discussion

#### A. Summary Judgment Standard

"As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1103 (7th Cir. 2008) (citations omitted). Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." **FED.R.CIV.P.** Rule 56(c). A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine only if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

"In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney,* 526 F.3d at 1104 (internal citations omitted). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

### B.      Undisputed Facts

On the basis of the pleadings and the expanded record, and specifically on the portions of that record which comply with the requirements of Rule 56(e), the following facts are undisputed for purposes of the defendant's motion for summary judgment:

Randolph began his employment with Coke as a member of the Teamsters Union on June 22, 1999. He started as a 2nd shift truck loader. Approximately two weeks later, Randolph was moved into the production department where he was responsible for loading empty bottles onto Coke's assembly line so the bottles could be filled with product. In late 2004, Coke eliminated the production department and bottling division to focus solely on distribution. As a result, Randolph's job was eliminated and Coke gave him a 2nd shift truck loader job. At the time of his termination, Randolph was still designated as a truck loader, but had transferred to 1st shift where he was responsible for unloading product off the trucks.

*Attendance Policy*

All Coke employees, including Randolph, receive a copy of the Rules and Regulations and Coke's Attendance Policy ("Attendance Policy"). Under the Attendance Policy, absences generally incur one point. The Attendance Policy specifically excuses FMLA-qualifying absences.

Employees are assigned no points under Coke's Attendance Policy if they report to work on time and work a portion of the day. Each tardy results in the award of 0.5 point. Employees also receive 0.5 point for failing to clock in or out appropriately. Points remain "active" for a rolling 12 month period. Once an employee incurs 5 points, he/she receives a verbal reprimand. At 7.5 points, the employee receives a written reprimand. When an employee reaches 10 points, he/she is terminated at the first available opportunity. Former Coke employee Marshall Banter (who is white) had accrued 9 attendance points and then had 2 unexcused absences in a row (back-to-back days), bringing his total to 11 points. When Banter next reported to work, on January 4, 2005, he was informed immediately that pursuant to the Attendance Policy, his employment was terminated. Since implementation of the Attendance Policy, every employee who has accrued 10 attendance points has been terminated by Coke.

*Inventory Count*

While working as a truck loader, Randolph failed to perform accurate product inventory counts. Initially, Randolph used an "Inventory Check Sheet" to keep track of what product was actually on the incoming trucks. The Inventory Check Sheet is a pre-printed list of all Coke product that is purportedly on each incoming truck. Loaders are required to check the sheet against product that is actually on the truck to ensure a correct inventory count. Randolph, however, simply checked off the inventory listed on the Inventory Check Sheet without confirming that the product listed on the sheet was actually on the truck. Consequently, on multiple occasions, Randolph inaccurately recorded the inventory on the truck.

Due to Randolph's inaccurate recording, his supervisor, Jim Eads, gave Randolph a blank sheet and told him to write down each piece of inventory he actually saw on each incoming truck so that Coke would have an accurate inventory count. Randolph was the only person who repeatedly failed to accurately count inventory, and Eads determined that using a blank sheet was an easy way to correct this performance issue. Eads' solution improved Randolph's performance. Eads offered to allow Randolph to return to using the "Inventory Check Sheet," but Randolph refused because he was comfortable working with the blank sheet of paper. Coke never imposed formal, written discipline on Randolph for failing to maintain an accurate inventory count, nor did it reduce his pay. In fact, because he wrote down each piece of inventory rather than simply check off a list, Randolph sometimes received overtime pay for the extra time spent ensuring his count was accurate. Randolph never filed a grievance with the Union over use of the Inventory Check Sheet, nor did he complain that he felt that he was being subjected to discriminatory treatment.

*Harassment on the Job*

Randolph's Complaint alleges that during his employment with Coke, he was subject to "name calling." The first incident occurred in January 2000. After Randolph was called to the office of a female Coke employee over the public address system, co-worker Bruce Emery asked him, "Jerry, what does she want, more n - - dick?" Randolph reported the incident to supervisor Eads who immediately responded. Eads met privately with Randolph to solicit his input as to what discipline Randolph felt was appropriate. Eads and Randolph discussed a number of options, including termination. Randolph insisted that he did not want Emery terminated, nor did he want Emery to receive any written discipline. Rather, Randolph told Eads that he simply wanted Emery to apologize. While Emery did apologize, Eads also imposed formal, written discipline and told Emery that any additional statements would not be tolerated. Randolph filed no grievance. Randolph told Eads that he was satisfied with Coke's handling of the situation.

The next "name calling" incident occurred more than one year later, on or about April 10, 2001, and again involved Emery. Emery made reference to a job being completed by an outside contractor as being "n - - rigged." The comment was not directed at Randolph, but he overheard it and immediately reported it to a supervisor, Tom Tooley, who then told Eads. Even though the comment was not directed at Randolph, Eads privately discussed the incident with Randolph. Eads' first impulse was to terminate Emery because Emery had been previously warned about his language. As with the January 2000 incident, Randolph was adamant that he did not want Emery terminated. Rather, he simply wanted Emery to

3

stop using inappropriate language. Eads did not discharge Emery, but he suspended Emery for one day without pay. Eads also put a formal, written notice of discipline in Emery's file and notified Emery that any further instances would result in automatic termination. Randolph filed no grievance. As before, Randolph told Eads that he was satisfied with the way Coke handled the situation.

Randolph claims that during the time he was assigned to the production department, another Coke employee, Rod Harper, called him a "Black Sambo" on two occasions. Randolph never reported these comments to management, nor did he file a grievance or complaint with the Union. Coke was unaware of these incidents. Randolph testified in his deposition that a white employee, Jeremy McBride, had a similar experience and was "cussed out" by Harper. Randolph also never reported this incident to any supervisor.

The final incident occurred in October 2005 when Coke employee Dick Tabler used the "n" word when speaking to another Coke employee in Randolph's presence. Although the comment was not aimed at Randolph, he reported the comment. Randolph told Coke's management that he did not want Tabler fired, but simply wanted him to watch his language. As a result, Tabler was issued a written warning. Randolph filed no grievance with the Union, nor did he have any other incidents with Tabler. According to Randolph, these incidents were the only incidents of "racial harassment" that occurred during his employment.

*Foot Injury*

On February 22, 2006, Randolph was injured when a pre-mix tank which had not been secured fell on his foot. Randolph immediately reported the injury to his supervisor, Don Cardwell. Pursuant to policy, Cardwell reported the injury to Plant Manager Mike Fox. At the time, Cardwell was the only supervisor present in the warehouse and could not leave the warehouse unattended to take Randolph to the hospital. Rather than call 911, Coke called Randolph's wife to ask if she could pick him up and take him to the hospital. Randolph's wife picked him up about an hour later and Randolph was treated that day at the St. Joseph Med One Clinic.

Randolph took leave for approximately three weeks and returned to work on or about March 20, 2006. During the leave, Coke's workers' compensation carrier paid Randolph's salary and all the medical bills associated with the injury. Coke assessed no attendance points during Randolph's absence, and Randolph filed no grievance with the Union.

*Time Clock*

Between January 12, 2004 and December 4, 2004, Randolph had problems with Coke's time clock, claiming that the clock failed to accurately record his clock in and clock out times. As a result, Randolph claimed that he had accrued half points for being tardy. After he told supervisor Eads about it, Eads advised Randolph to call him when he clocked in and clocked out so that Randolph's times could be recorded accurately and he would not be assessed points in error. Other Coke employees, including white employees, reported having the same trouble with their time cards and being assessed points for clocking in late. In fact, a white employee, Marilyn Bell, reported the same problem with her time card and, like Randolph, was told to call her supervisor when she clocked in and clocked out so that

4

her time could be recorded accurately and she would not be incorrectly assessed attendance points. Randolph filed no grievance with the Union regarding these issues.

*Events Leading To Randolph's Termination*

On December 12, 2006, Randolph had a wisdom tooth extracted. Randolph was prescribed Amoxicillin to prevent infection and Hydrocodone for pain. On January 2, 2007, Randolph told Eads the Hydrocodone was making him feel dizzy. Eads advised Randolph to go home for the day and did not assess Randolph any attendance points. Randolph returned to work the next day and missed no more work until January 23, 2007.

On January 23, 2007, Randolph left work early because of a toothache. That same day, Randolph visited his dentist, who again prescribed Amoxicillin and Hydrocodone. Randolph did not ask his dentist for a note excusing him from work, and his dentist did not provide one. Because he had worked part of the day on January 23, 2007, Coke assessed Randolph no attendance points that day.

Randolph failed to report to work on January 24, 2007. As a result of his January 24, 2007 absence and pursuant to the Attendance Policy, Randolph was assessed his 10th and final point on January 24, 2007, and was thereafter discharged when he arrived for work on January 25th.

Randolph filed a grievance regarding his termination on January 29, 2007. In the grievance, Randolph stated that he thought "they would no [sic] what I was sick with."[1] Randolph also stated that Eads, his supervisor, had Randolph's phone number. A grievance meeting was held on February 1, 2007. Randolph was present as was Union Representative Glen "Chico" Adams. Also present were Plant Manager Mike Fox and Union Stewards Gary Trent and Joe Gifford. Randolph had an opportunity to state his case regarding his termination. Randolph never mentioned race, racial harassment, or that he should have been given FMLA leave. Rather, Randolph argued that other unnamed Coke employees had also accrued 10 attendance points but had not been terminated. On February 6, 2007, the Union denied Randolph's grievance and informed him that his termination would stand. After his termination, Randolph filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 5, 2007 ("EEOC Charge") alleging that Coke had discriminated against him based upon his race.

### C.    Conclusions of Law

*Timeliness of Claims*

Randolph filed his EEOC charge on April 5, 2007. A plaintiff has 300 days from the date that "alleged unlawful employment practice[s]" occur in which to file a timely EEOC charge of discrimination. *Sharp v. United Airlines,* 236 F.3d 368, 372 (7th Cir. 2001); 42 U.S.C. § 2000e-5(e)(1). "The 300-day limit . . . begins to run when the defendant has taken

---

[1] Randolph alleges that he called in to work on January 24, 2007, to report he would not be in. Regardless of whether Randolph called in or not, pursuant to the Attendance Policy, he still would have been assessed a point for failing to report to work.

5

the action that injures the plaintiff and when the plaintiff knows [ ]he has been injured, not when [he] determines that the injury was unlawful." *Sharp,* 236 F.3d at 372 (internal quotations and citations omitted). Generally speaking, a plaintiff is only allowed to base a Title VII suit on conduct occurring within the limitations period. *Galloway v. General Motors Service Parts Oper.*, 78 F.3d 1164, 1166 (7th Cir. 1996). Coke argues persuasively that several of Randolph's claims, including his allegations of racial harassment, failure to take him to the hospital after his on-the-job foot injury, and the failure of the time clock to accurately record his time in and out of work, are time-barred because they occurred more than 300 days before he filed his charge.

Claims related to any incidents which occurred prior to June 9, 2006 (300 days prior to the date Randolph filed his EEOC charge), are not timely.  The incidents in which co-workers used racially charged language occurred in 2000, 2001, 2004, and October 2005. The foot injury occurred on February 22, 2006. The problems with the time clock occurred in 2004. Randolph did not file his EEOC Charge within 300 days of these incidents. Accordingly, those claims are time-barred and Coke is entitled to summary judgment as to such claims.

*Job Termination*

Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating against individuals on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "It is well-established that a plaintiff in a Title VII case may proceed under a direct or indirect method of proof." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004); *see also Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Direct evidence is evidence that, if believed by the trier-of-fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003); *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir. 1997). The direct evidence must show that the defendant said or did something indicating discriminatory animus with regard to the specific employment decision in question. *Id.* In short, "[d]irect evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rogers,* 320 F.3d at 753 (internal quotation omitted). "A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Rhodes v. Ill. Dept. of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994)). "That circumstantial evidence, however, 'must point directly to a discriminatory reason for the employer's action.'" *Id.* (quoting *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003)).

Under the alternative method, in *McDonnell Douglas,* the Supreme Court "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory treatment cases." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993). The test consists of three steps. First, the plaintiff must establish a *prima facie* case of discrimination. Second, once the *prima facie* case is established, the defendant must state a legitimate, non-discriminatory reason for the adverse employment action. Finally, if a legitimate, non-discriminatory reason is offered, the plaintiff must come forward with evidence to show that the stated reason is not the true one, but only a pretext for discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973); *DeLoach v. Infinity Broadcasting,* 164 F.3d 398, 401 (7th Cir. 1999).

Because Randolph has not provided any direct evidence of discrimination he must proceed under the burden-shifting test established in *McDonnell Douglas*. *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005). To set forth a *prima facie* case of race discrimination under Title VII, Randolph must show that: 1) he is a member of a protected class; 2) he was meeting his employer's legitimate performance expectations; 3) he suffered an adverse employment action; and 4) other similarly situated employees who were not members of the protected class were treated more favorably. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). "An employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 540.

Coke argues that Randolph has failed to satisfy the second and fourth prongs of his *prima facie* case. Coke contends that Randolph did not meet its legitimate performance expectations in the area of attendance. On January 24, 2007, Randolph did not report to work and he was assessed his 10th and final point over the prior 12 month period.

Randolph argues that he had accrued 7.5 attendance points between January 12, 2004, and December 6, 2004 and that those points should have "rolled off" before his termination. Coke agrees. In fact, the 7.5 points that accrued in 2004 were not counted toward the points that compelled his termination. Randolph had accrued 10 additional points, beginning on February 3, 2006.

Randolph also argues that the time he had to take off work after his foot was injured at work should not have been counted as attendance points against him. Again, Coke agrees. Randolph was paid for the time he took off due to the injury, his medical bills were paid, and no attendance points were assessed during his absence. Moreover, this injury occurred in 2004 and was not within the scope of the relevant period of time considered when he was terminated from his job.

In a further attempt to discredit the number of points he was assessed, Randolph argues that he should have been offered leave under the FMLA (which would have been an excused absence) when he had a toothache on January 23, 2007.  He went to work on January 23, 2007, but left early and went to the dentist for treatment. He was not assessed any attendance points on January 23, 2007. Randolph had worked on January 22, 2007, but did not report to work on January 24, 2007. He reported to work on January 25, 2007.

An employee is entitled to FMLA leave if he can demonstrate that he suffers from a "serious health condition" that prevents him from performing the functions of his job. *Smith v Hope School*, 560 F.3d 694, 699-700 (7th Cir. 2009); 29 U.S.C. § 2612(a)(1)(D). The FMLA defines an employee with a "serious health condition" as one who has "an illness, injury, impairment, or physical or mental condition that involves-(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Applicable regulations provide that "continuing treatment by a health care provider" includes a period of incapacity of more than three consecutive full calendar days, with other restrictions. 29 C.F.R. § 825.115(a). Randolph's dental problem in January 2007 did not require him to miss three full, consecutive days at work. Accordingly, it did not qualify as a serious health condition. Even if he had *requested* leave under the FMLA, which he did not, it would not have qualified as such. In

7

sum, Randolph has failed to present evidence that creates a genuine issue of fact that he was satisfying Coke's legitimate attendance requirements.

As to similarly situated employees, Randolph argues that a white employee, Marshall Banter, was allowed 11 points before he was fired, while Randolph was fired after accruing only 10 points. Randolph has not shown, however, that Banter was a similarly situated employee who was treated more favorably. Rather, Coke has shown that Banter had accrued 9 attendance points and then had 2 unexcused absences in a row (back-to-back days), bringing his total to 11 points. When Banter next reported to work, on January 4, 2005, he was terminated. Accordingly, Randolph has failed to satisfy the second prong of his *prima facie* case and Coke is entitled to summary judgment.[2]

### III.  Conclusion

Judgment as a matter of law is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). That is the case here. Randolph has failed to present evidence sufficient to establish the second and fourth prongs of his *prima facie* case. Randolph has not identified a genuine issue of material fact as to his claims in this case, and the defendant is entitled to judgment as a matter of law. Accordingly, the defendant's motion for summary judgment (dkt 36) must be **granted**. Judgment consistent with this Entry shall now issue.

The settlement conference set on February 17, 2010, the final pretrial conference of February 26, 2010, and the jury trial of March 15, 2010, are each **vacated.**

**IT IS SO ORDERED.**


Date:   01/25/2010


_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

---

[2]Randolph's claim that he was required to use a blank sheet of paper to record inventory instead of the Inventory Check Sheet warrants little discussion. Randolph has shown no adverse action as a result of being allowed to keep inventory in a manner different from every other comparable worker, allowing him to improve his accuracy. This claim is meritless.